UNITED STATES of America,

v.

John F. "Duffy" CONLEY, William C. Curtin, Sheila F. Smith, John Francis "Jack" Conley, Thomas "Bud" McGrath, Mark A. Abbott, Thomas Rossi, William Steinhart, Roberta Fleagle, Robin Spratt, Monica C. Kail, William J. Reed, Joanne T. Smith, Kenneth "Ron"

Goodwin, Lawrence N. "Neudy" Demino, Sr., Christopher "Chris" Kail, Joseph A. Devita, Frank Garofalo, Thomas D. Ciocco, Michael Sukaly, Phillip M. "Mike" Ferrell, Anestos "Naz" Rodites, and William E. Rusin, Defendants.

Crim. No. 91–178.

United States District Court,
W.D. Pennsylvania.

July 11, 1994.

878

Frederick W. Thieman, U.S. Atty., for the W.D.Pa., James R. Wilson, Asst. U.S. Atty., for W.D.Pa., William D. Braun, Crim.Div., U.S. Dept. of Justice, Washington DC, for plaintiff.

James Wymard, William Difenderfer, Anthony Mariani, Ellen Viakley, Gary Gerson, Caroline M. Roberto, Joel Johnston, Stanley Greenfield, Martha Bailor, Ray Radokovich, Carmen Martucci, Lee Markovitz, Edward J. Osterman, William Acker, Foster Stewart, Joseph Kanfoush, Carl Max Janavitz, Raymond M. Maloney, John Goodrich, Gary B. Zimmerman, Vincent Baginski, John Zagari, James Andring, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court are the Pretrial Motions Filed on behalf of Defendant Phillip M. "Mike" Ferrell: Motion to Suppress Evidence (Document No. 379, in part), and Pretrial Motions Filed on behalf of Defendant Phillip M. "Mike" Ferrell: Motion to Return Seized Property. (Document No. 379, in part). Defendant Ferrell's motion to suppress relates to the October 1, 1991 search of his home. Defendant Ferrell's motion to return seized property relates to cash seized during the search of his home. The Court will deny the motion to suppress and will dismiss without prejudice the motion to return seized property.[1]

### Findings of Fact

1. On September 30, 1991, FBI Agent Andrea Dammann presented to (then) United States Magistrate Judge Gary L. Lancaster an application and affidavit of probable cause for a search warrant for the premises located at 1274 Kirsopp Avenue, Pittsburgh, Pennsylvania (the "Kirsopp Avenue affidavit").[2] The premises to be searched were Ferrell's residence.

1. On October 1, 1991, the FBI seized $14,024.00 from the Ferrell residence. On May 18, 1992, Defendant Ferrell filed his motion to return of seized property. (Document No. 379, in part). On June 19, 1992, the FBI notified the Ferrells of the impending forfeiture of these funds and advised them how to contest it. On July 30, 1992, the Ferrells filed a letter with the FBI contesting the forfeiture of the money.

On June 25, 1993, the United States filed a Complaint for Forfeiture against the $14,024.00 which was designated Civil Action No. 93–1006 and assigned to the Honorable Gustave Diamond. On January 6, 1994, the United States and Ferrell through his counsel in the present case, filed a stipulation with the court agreeing to stay the civil forfeiture action "until the conclusion of the related criminal case against Phillip M. "Mike" Ferrell." On January 10, 1994, Judge Diamond signed an order staying the civil forfeiture case until the conclusion of this prosecution. This Court, therefore, will dismiss Defendant Ferrell's motion to return seized property without prejudice to Defendant Ferrell's rights in the civil forfeiture action.

2. The warrant bears the designation 91–269M–1 and is now located at Crim. No. 91–178, Document No. 910. On June 17, 1994, this Court ordered that the warrant and other material found at 91–269M, be unsealed. (Document No. 909). In reviewing the materials to be unsealed, the Government discovered that two of warrants were filed with the wrong affidavits, to wit, the Kirsopp Avenue warrant (91–269M–1) was coupled with the affidavit in support of the warrant for a Third Street, Carnegie, Pennsylvania address (91–269M–2) and vice versa. See (Document No. 906). The Court afforded Defendant Ferrell an opportunity to address any issues raised by this discovery, (Document No. 909), but Defendant Ferrell did not file a supplemental brief. It appears nonetheless that Defendant Ferrell addressed the affidavit intended to sup-

2. The search warrant described the structure to be searched and authorized the seizure of the following items:

(a) Any and all monies realized from the operation of the video poker machines and any and all containers for said coins and currency.

(b) Any and all gambling paraphernalia and records including but not limited to: names and addresses of the owners, users, routemen, collectors, movers, solicitors, salespersons, servicemen, distributors, and manufacturers relating to the video poker machines; contracts setting forth agreements between vendors and the establishment for video poker machines; documents, ledgers, books regarding the machine usage, number of plays, amounts deposited in the machines, amounts of payoffs to winners, percentage and income earned by vendor and establishment from video poker machines.

(c) Any and all business records reflecting banking transactions, canceled checks, purchase and sales orders, invoices, shipping and receiving receipts; and invoices relating to Sheila Smith, Sheila Kelly, Duffy Conley, Duffy's Vending, Three Rivers Coin, Matrix, Premier Enterprises, T.D. Amusements, Chartiers Vending and S & M Vending from 1986 to the present.

(d) Any and all documents relating to loans and/or other financial transactions between vendor and establishment.

(e) Electronic data processing and storage devices, computers and computer systems including central processing units; internal and peripheral storage devices such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices or other memory storage devices; peripheral input/output devices such as keyboards, printers, video display monitors, optical readers, and related communications devices such as modems; together with system documentation, operating logs and documentation, software and instruction manuals.

All of the above records, whether stored on paper, on magnetic media such as tape, cassette, disk, diskette or on memory storage devices such as optical disks, programmable instruments such as telephones, "electronic address books", calculators, or any other storage media, together with indicia of use, ownership, possession, or control of such records.

All of which constitute fruits, instrumentalities and evidence of the offense of operating an illegal gambling business, in violation of Title 18, United States Code, Sections 2 and 1955.

Warrant, at 1–2.

3. In the Kirsopp Avenue affidavit, Agent Dammann states the following regarding her sources of information:

2. I am knowledgeable of the facts set forth herein as a result of my involvement in the Duffy Conley investigation, including my interviews of witnesses; discussions with other special agents of the FBI and IRS; review of statements given by witnesses to other law enforcement officers in this investigation; review of grand jury transcripts and memoranda of interviews of several witnesses; review of documents gathered during the course of this investigation; and my own observations and surveillance during the course of this investigation.

4. Stating that it was a description of an illegal *per se* video poker machine under Pennsylvania law, the Kirsopp Avenue affidavit included the following quote from *United States v. 294 Various Gambling Devices*, 718 F.Supp. 1236 (W.D.Pa.1989) (Weber, J.):

The machine displays the time honored ranking of poker hands and the number of points the machine will award for the listed hands. The ranking of hands is grounded in laws of statistical probability, and the video poker machine awards points based on this scale, although it does not award

port the Kirsopp Avenue warrant. *See* (Document No. 825).

The Court notes that it previously issued a Memorandum Opinion, (Document No. 762), addressing Defendant Thomas D. Ciocco's challenge to the warrant and affidavit at 91–269M–3. All of the warrants issued at 91–269M were prepared by S.A. Dammann and were substantially similar in content.

true odds. The higher rank of the hand, the higher the amount of points awarded.

Upon insertion of a quarter, the machine displays five cards on a video screen. These five cards are randomly selected by the machine from an ordinary deck of 52 cards in four suits. In an effort to improve the hand dealt to him, the player may then "discard" any of the five original cards by pressing the appropriate buttons on the machine. The machine then displays new cards to replace the ones discarded. The machine automatically evaluates this final array of five cards, ranks it as a poker hand, and awards points as indicated above.

This in all its simplicity is the sum total of the game of video poker.

Up to now we have employed the term "points" to describe the units awarded to the player by the machine for winning poker hands. No matter whether an individual machine labels it "score," credits, or "games," each point entitles the player to one free play of the machine. Each play of the game has one object: the accumulation of additional free games, and these free games may be accumulated from game to game so that, with a run of luck, a player may accumulate a significant number of free games.

When a machine is used as a gambling device, these free games are converted to cash by a bartender or owner of the establishment that houses the machine. A successful player in such an establishment is paid a quarter for each "credit" accumulated on the machine. The bartender or owner, having verified the number of credits and paid the player, then removes or "knocks off" the player's accumulated credits, returning the machine to zero credits to await the next player's coins.

Kirsopp Avenue affidavit, at 3–4, ¶ 6.

5. The Kirsopp Avenue affidavit indicates that a Cooperating Witness ("C.W.") was granted immunity on April 24, 1991, has provided information to law enforcement officers and prosecutors approximately five times since April 9, 1991 and has testified before the federal grand jury in this case. The Kirsopp Avenue affidavit indicates that C.W. was represented by counsel at each of his meetings with government representatives.

6. The Kirsopp Avenue affidavit states that C.W. has known Duffy Conley and worked for his business from November, 1986 until the (then) present time, C.W. has no criminal record and the information provided by C.W. in this case has proven to be truthful and accurate in every instance where the FBI and IRS attempted to verify it.

7. Paragraphs 4(a)–(n) of the Kirsopp Avenue affidavit details the information C.W. furnished to law enforcement officials and prosecutors. Paragraphs 11 through 19 of this Opinion corresponds to paragraphs 4(a)–(n) of the Kirsopp Avenue affidavit.

8. C.W. was hired in November, 1986 by Duffy Conley and Duffy's Vending, also known as Three Rivers Coin, which at that time was located at Third Avenue and Third Street, Carnegie, Pennsylvania and at Conley Motor Freight, 930 Saw Mill Run Boulevard, Pittsburgh, Pennsylvania.

9. After his first month of employment, C.W. began repairing video poker machines owned by Duffy's Vending, which were in place at various business establishments and private clubs in the Western District of Pennsylvania. These machines were operationally equivalent to the illegal machines described in *294 Various Gambling Devices*. Although there were "on paper" changes to the structure of Duffy Conley's illegal gambling business, C.W. continues to work for Duffy in substantially the same capacity at the present time.

10. From November 1986 to January 1990 Duffy Conley's video poker machine business operated as follows:

Duffy Conley was the owner and operator of Duffy's Vending. Duffy's Vending owned both legitimate vending machines and games as well as video poker machines throughout the Western District of Pennsylvania. During that time period, C.W. observed Duffy Conley acting as collector, emptying money from the video poker machines at certain locations. C.W. also observed Duffy Conley splitting money with the owners of several of the locations where the video poker machines were lo-

cated. Duffy Conley's role in this organization was also made clear to C.W. when C.W. attended and participated in several business meetings of the employees of Duffy's Vending in 1988. In fact, at one of these meetings, an organization chart was provided to the employees in attendance. In addition to Duffy Conley, the management of Duffy's Vending from November of 1986 to January of 1990 consisted of Bill Curtin, who was in charge of "tech" people (repairmen) and movers; Sheila Smith, who was in charge of bookkeeping and dispatching service calls; and Michelle Farer, who was in charge of the collectors.

Kirsopp Avenue affidavit, 6–7, ¶ 4(c).

11. In addition to C.W., four tech people and three movers worked out of the Third Avenue and Third Street address, responding to service requests relayed to them by Sheila Smith, a.k.a. Sheila Kelly, and John Francis "Jack" Conley. Sheila Smith and Jack Conley relayed these service calls from the Conley Motor Freight premises.

12. In the summer of 1988 the tech people and movers relocated their base of operations from the Third Avenue location to a building located at 3105 Windgap Avenue, Ingram, Pennsylvania, in order to accommodate the approximate doubling of locations in which Duffy's Vending had video poker machines, from 150 in 1986 to about 300 in 1988.

13. Throughout this time-period, employees of Duffy's Vending received wages by paycheck. C.W. was also reimbursed in cash for expenses, and, in addition, C.W. and certain other employees received a weekly bonus based upon performance. This bonus was paid in small bills in a sealed envelope, and unlike the paycheck, never had taxes deducted from it by Duffy's Vending.

14. In December, 1989, the Windgap Avenue location was raided by federal agents and U.S. Marshals. Approximately two weeks later, Duffy Conley began to reorganize his video poker machine business. Four new companies were created—Matrix, Chartiers Vending, T.D. Amusements, and S & M Vending. They were still operating at the time of the Kirsopp Avenue affidavit.

15. Subparagraphs 4(h–m) of the Kirsopp Avenue affidavit details the reorganization and subsequent operation of the gambling business:

(h) The reorganization began as follows: In approximately January, 1990, Duffy Conley asked C.W. if C.W. would be interested in forming and operating a service company which would do service work for three vending companies. This new company would be formed with financial support and at the direction of Duffy Conley. After C.W. informed Duffy Conley that he would be interested in such a proposition, Duffy Conley told C.W. to choose two tech people to work for him. Duffy Conley further instructed C.W. to get a tax I.D. number for this new business. Duffy Conley provided money to C.W. to open a bank account for the business, provided a building in C.W.'s name to be used as the location for the business, and provided C.W. with start up money. Duffy Conley and C.W. agreed that the new company would be named "Matrix". A fictitious name registration was accomplished for Matrix and C.W. was registered as the owner and operator of Matrix. The building which was provided by Duffy Conley for Matrix was located at 324 Helen Street, McKees Rocks. This building had been owned by Duffy Conley but was placed in C.W.'s name for use by Matrix.

(i) Matrix was to service three vending companies exclusively. C.W. later learned that these three vending companies— Chartiers Vending, T.D. Amusements, and S & M Vending—were recently formed businesses in the names of Rick Reed, Tom Ciocco and Phillip M. "Mike" Ferrell, respectively. Reed, Ciocco, and Ferrell, like C.W., had merely been employees of Duffy's Vending prior to January of 1990. Specifically, Ciocco and Ferrell had been collectors for Duffy's Vending, Reed had been a mover, and C.W. had been a tech person. However, through the funding and instruction of Duffy Conley, these three individuals, along with C.W., were now the owners of new businesses.

(j) After Rick Reed, Tom Ciocco and Mike Ferrell were registered as the owners of the three businesses named above,

the owners of the various video poker machine locations were led to believe that the video poker machines were owned by those companies and not Duffy's Vending or Three Rivers Coin. As of January of 1990, Duffy Conley wanted it to appear that he was connected only with "legitimate" (not video poker) vending machines and games. Despite the creation of the three new vending companies and the apparent "transfer" of control and/or ownership of the video poker machines, Duffy Conley to this date remains in charge of an ever-expanding network of video poker machine locations, including those that appear to be owned by the newly created vending companies, just as he remains in charge of Matrix's maintenance of those machines. The reorganization was merely a paper transaction, with all of the persons involved still performing essentially the same duties as they did prior to the creation of those businesses in January of 1990. The purpose of the reorganization was simply an attempt to remove Duffy Conley's name from the video poker machine business. Since the reorganization, the gambling operation involving the video poker machines operates as follows:

(1) The video poker machines were divided among Chartiers Vending, T.D. Amusements and S & M Vending. These three companies, through Reed, Ciocco and Ferrell, collect proceeds from their video poker machines at the various locations, just as they did when they were formal employees of Duffy's Vending. All three of these companies pay Matrix a monthly retainer as directed by Duffy Conley to cover Matrix's expenses in accomplishing the repairs of the video poker machines at the locations. Reed, Ciocco and Ferrell received Matrix business cards to distribute at the various locations so that when those locations experience problems with their video poker machines, they could call Matrix directly. After collecting money from the various locations, Chartiers Vending, T.D. Amusements and S & M Vending dispose of the money in accordance with Sheila Smith's directions. The sole purpose of Chartiers Vending, T.D. Amusements and S & M Vending is to maintain a network of video poker machines and collect the proceeds thereof for Duffy Conley.

(2) Matrix began operating on January 15, 1990, and for the first two weeks, Matrix serviced both the video poker machines for the three companies as well as the legitimate vending machines and games owned by Duffy's Vending/Three Rivers Coin. From February 1, 1990 up to and including the present, however, Matrix services only video poker machines, primarily those of Chartiers Vending, T.D. Amusements and S & M Vending. These machines are used as illegal gambling devices as described by the late Judge Weber. Matrix no longer has anything to do with the legitimate vending machines and games owned by Three Rivers Coin. This separation of service was done at the direction of Duffy Conley and Bill Curtin. As a result of this separation, when a location is experiencing problems with both a legitimate vending game and a video poker machine, a tech person employed by Duffy's Vending/Three Rivers Coin will go to that location to service the legitimate machine and a Matrix tech person will go to service the video poker machine.

(3) Matrix has nine employees, including C.W. These employees' paychecks are drawn on the Matrix bank account which was opened when Matrix was formed. Matrix receives $4,000 per month from Chartiers Vending; $5,000 per month from T.D. Amusements; $4,000 per month from S & M; and approximately $1,100 per month from two other individuals who operate video poker machines not in the name of either Chartiers Vending, T.D. Amusements or S & M Vending. These amounts are not related to the number of services performed by Matrix on the video poker machines. Rather, Duffy Conley determines how much is to be paid by these five sources to Matrix, and this is the only source of income for Matrix. Matrix exists only to service video poker machines and does not attempt to make a profit but rather uses all funds received to pay wages and expenses.

(k) Since Matrix was formed in January of 1990, C.W. meets with Duffy Conley every Friday at Duffy Conley's residence. At these meetings, C.W. and Duffy Conley discuss the operation of Matrix and C.W. picks up sealed cash envelopes for the employees of Matrix.

(l) In approximately January of 1990, Sheila Smith's job, unlike the jobs of C.W., Reed, Ciocco and Ferrell, changed. As set forth above, dispatching was no longer being used for service calls. Instead, Matrix was receiving the service calls directly. Sheila Smith's new role in the organization was to be the owner and operator of a new business called "Premier Enterprises." Sheila Smith is the only known employee of Premier Enterprises. The function of Premier Enterprises was and is to oversee the three vending companies referenced above, i.e., Premier Enterprises through Sheila Smith, is in charge of collections. Rick Reed has informed C.W. that he (Reed) cannot issue a monthly check to Matrix until Sheila Smith authorizes Reed to do so.

(m) C.W. first described the new vending companies as being operative shortly after January, 1990. He stated they operated consistent with that arrangement continuously through his interview on September 11, 1991. C.W. continues to receive monthly payments from Chartiers Vending, T.D. Amusements, and S & M Vending for the sole purpose of supporting the maintenance of a poker machine repair facility.

Kirsopp Avenue affidavit, at 9–14, ¶¶ 4(h–m).

16. C.W. believes that Reed, Ciocco and Ferrell operate their vending businesses out of their homes and that Reed lives with his mother, Ferrell lives in Beechview and the exchange for S & M Vending is 344, a Beechview exchange, and Ciocco recently purchased a home in Penn Hills.

17. In addition to the information that C.W. furnished to law enforcement personnel, the Kirsopp Avenue affidavit further avers that in July, 1990 the FBI raided several business establishments and clubs in the Western District of Pennsylvania, including Matrix, and seized over 60 video poker machines. C.W. confirmed that most of the video poker machines seized during these raids were owned by Duffy Conley and used in his illegal gambling business.

18. The Kirsopp Avenue affidavit avers that Special Agent Charles Duffy examined the video poker machines seized during the July, 1990 raids and determined them to be operationally equivalent to the illegal machines described by Judge Weber in *United States v. 294 Various Gambling Devices.* The only difference between the machines described by Judge Weber and the machines seized in July, 1990 was that most of the seized machines were equipped to receive $1, $5, $10 and $20 bills rather than quarters.

19. The Kirsopp Avenue affidavit avers that independent investigation confirmed that "... 324 Helen Street, McKees Rocks, Pennsylvania, which is the address of Matrix, is listed in the deeds registration records of Allegheny County in the name of C.W. Title searches confirmed that Duffy Conley sold this property to C.W. in or about January of 1990." Kirsopp Avenue affidavit, at 15, ¶ 7(a).

20. The Kirsopp Avenue affidavit avers that independent investigation confirmed that Chartiers Vending is a sole proprietorship registered in the Pennsylvania Corporation Bureau's Fictitious Name Index in the name of Richard Reed, 426 Third Avenue, Carnegie, Pennsylvania.

21. The Kirsopp Avenue affidavit avers that independent investigation confirmed that T.D. Amusements is a sole proprietorship registered in the Pennsylvania Corporation Bureau's Fictitious Name Index in the name of Thomas D. Clocco [sic], P.O. Box 810, Mckees Rocks, Pennsylvania.

22. The Kirsopp Avenue affidavit avers that independent investigation confirmed that S & M Vending is a sole proprietorship registered in the Pennsylvania Corporation Bureau's Fictitious Name Index in the name of Phillip M. Ferrell, 1274 Kirsopp Avenue, Pittsburgh, Pennsylvania.

23. The Kirsopp Avenue affidavit avers that independent investigation confirmed that Allegheny County property records indi-

cate that Thomas D. Ciocco resides at 11404 Frankstown Road, Pittsburgh, Pennsylvania.

24. The Kirsopp Avenue affidavit avers that a search warrant for Sheila Smith's residence was obtained on the basis of information from C.W. and other sources, and a search of her residence was conducted on September 20, 1991. The search of Sheila Smith's residence resulted in the seizure of items relating to Reed, Ciocco and Ferrell.

25. Relating to Reed, the following items were seized:

(1) Pittsburgh National Bank checking account statement dated July 1, 1990, addressed to Richard C. Reed D/B/A, Chartiers Vending, 426 Third Avenue, Carnegie, Pa 15106–2521. Included in this statement were the following cancelled checks: Number 168 for $1000.00 payable to John Conley with "Consultant Fee" written in the Memo, Number 170 for $3000.00 payable to John Conley with "Equipment–Payment" written in the Memo, and Number 171 for $4000.00 payable to Matrik [sic] Services with "Services" written in the Memo.

(2) An address book listing Ricky Reed, 426 3rd Ave., (which is the registered address of Chartier's Vending), 645–1077, 429–0165.

(3) Collection's Record [sic] dated 9–6–91 for Poker location Scottish Rose, Collector 2–Ricky.

(4) Paper with notes to Ricky stating "Roma loan for new locations."

Kirsopp Avenue affidavit at 16–17, ¶ 8(a)(1–4).

26. Relating to Ciocco, the following items were seized:

(1) Address book listing Tom, T.D. Amusement, P.O. Box 810, 765–7724, 921–4661, 922–7340.

(2) Numerous Collection's Record sheets [sic] dated 9/9–12/91, showing collections from poker machines from various locations by a collector designated by the code number 7. These were found in a brown paper bag with $17,010 in U.S. Currency. A slip of paper attached to the records showed a total collected $17,290, less $250 bank for Aces–Deuces and $30

Lunches for a net total of $17,010. Collector Number 7 has been identified by Rene Bann, a former Duffy's Vending employee, as Tom Ciocco.

(3) Receipt from Borough of Heidelberg dated 9–11–90, showing payment of $400.00 by T.D. Amusements for licensing of two poker machines at Town Tavern, 310 Third Street, Heidelberg, PA 15106.

Kirsopp Avenue affidavit at 17, ¶ 8(b)(1–3).

27. Relating to Ferrell, the following items were seized:

(1) Address book listing Mike, S & M Vending, 765–7727, 344–6270. (The 1991–92 Cole's Directory lists the address and subscriber for the latter phone number as 1274 Kirsopp Avenue, P. Michael Ferrell.)

(2) Business card for S & M Vending, Mike Ferrell, 344–1307. (The 1991–92 Cole's Directory lists the address and subscriber for this phone number as 1274 Kirsopp Avenue, P. Michael Ferrell.)

(3) Unexecuted agreement between Three River Coin and Phillip M. Ferrell, 1274 Kirsopp Ave., Pittsburgh, Pa. 15220, for Ferrell to purchase video machines from Three River Coin.

(4) Paper with note to Mike F with writing "Jimmy Millers stop" and "Call for Raffelles."

(5) Receipt from Municipality of Bethel Park, Pa., dated 2–1–90, showing payment of $400.00 for mech. license by S & M Vending.

Kirsopp Avenue affidavit at 17–18, ¶ 8(a)(1–4).

28. The Kirsopp Avenue affidavit further avers that a search warrant for Duffy Conley's residence was obtained on the basis of information from C.W. and other sources, and a search of his residence was conducted on September 20, 1991. The search of Duffy Conley's residence resulted in the seizure of the following items relating to Reed, Ciocco and Ferrell:

(a) Two pieces of paper listing various locations, including many locations known to contain video poker machines, with the notations of Mike F, Tom, and Rickey beside them.

(b) Two sheets of paper with the names Mike, Tom, and Rickie appearing above lists of locations. Many of the locations are known to contain video poker machines.

Kirsopp Avenue affidavit at 18, ¶ 9(a–b).

29. The Kirsopp Avenue affidavit further avers that in a search of trash picked up from the curb in front of 1274 Kirsopp Avenue on September 25, 1991, the following items were located:

(a) Various pieces of mail addressed to Michael Ferrell, 1274 Kirsopp Ave., Pittsburgh, PA 15220.

(b) One whole card and numerous torn up pieces of cards with "Come Play Our Video Poker Machines" printed across the top and calculations on the back.

(c) Torn up Non Traffic Citation form [sic] the City of Pittsburgh with writing "Poker Machines." "Gambling Device," and "Not Permitted" in reference to 4019 Butler St., Pittsburgh, PA 15201.

(d) Six receipts for payment of rent to Frank Gilberti by Duffy's Vending Co., dated 6–1–89, 8–5–89, 9–2–89, 10–10–89, 11–189, and 12–1–89.

(e) Torn up agreement of Sale for Donut's [sic] and Stuff to Ferrell and his wife by John F. Conley.

(f) Fragment of torn up check with notation "For De...," "S & M...," and 0385..." on the back. (S & M Vending has an account at Equibank with account number 03856811056.)

(g) Miscellaneous bill and coin wrappers, one with notation "$1500."

(h) Piece of paper with the notation "Stowe TWP," "1PK for Norwood Inn." (C.W. has indicated that the designation "PK" refers to a video poker machine.)

(i) Piece of paper showing readings from poker machine meters and calculations.

Kirsopp Avenue affidavit at 19–20, ¶ 10(a–i).

30. The Kirsopp Avenue affidavit concludes stating that the affiant has probable cause to believe that the items to be seized will be found on the premises to be searched.

Discussion

■ The standard of review to be employed in reviewing a search warrant is clear:

"[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." [*Illinois v.*] *Gates,* 462 U.S. [213] at 238, 103 S.Ct. [2317] at 2332 [76 L.Ed.2d 527 (1983)] (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place," id., a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found.

*United States v. Conley,* 4 F.3d 1200, 1205 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994). A judicial officer is entitled to draw reasonable inferences about where evidence is likely to be found, based upon the nature of the crime and the evidence sought. *United States v. Malin,* 908 F.2d 163, 166 (7th Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990). As the Court of Appeals for the Third Circuit has stated:

While ideally every affidavit would contain direct evidence linking the place to be searched to the crime, it is well established that direct evidence is not required for the issuance of a search warrant. Instead, probable cause can be, and often is, inferred by "considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property."

*United States v. Jones,* 994 F.2d 1051, 1056 (3d Cir.1993) (quoting *United States v. Jackson,* 756 F.2d 703, 705 (9th Cir.1985)).

■ Probable cause to believe that one has committed a crime does not establish probable cause to search that person's home, but it is not irrelevant to the inquiry. "If there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases." *Id.* at 1055–

56. Likewise, it is reasonable to conclude that co-adventurers in crime, similarly situated with respect to the items sought, will keep contraband or evidence in similar places. *Id.* at 1057. Thus, in *Jones,* the Third Circuit held that the magistrate had a substantial basis for finding probable cause to search one defendant's home, after connecting him to the crime, *id.* at 1056, since his residence was close to the scene of the crime and his co-defendants' homes and probable cause to search his co-defendants' homes existed. *Id.* at 1057.

■ The Magistrate Judge had a substantial basis for crediting the hearsay information in the Kirsopp Avenue affidavit. The Kirsopp Avenue affidavit clearly sets forth C.W.'s basis of knowledge—active participation over a long period in the crime detailed in the Kirsopp Avenue affidavit. Moreover, C.W.'s veracity and reliability was confirmed not only in the Fictitious Name Index and county property records, but also by the items seized in the searches of the residences of Duffy Conley and Sheila Smith. C.W. stated that the reorganization detailed to law enforcement personnel was a front, a change only on paper. Sheila Smith and Duffy Conley, who had no apparent corporate connection to Reed, Ciocco and Ferrell, were found to possess business and financial records relating to the new businesses of Reed, Ciocco and Ferrell. Moreover, the items seized in the searches detailed in the Kirsopp Avenue affidavit were consistent with C.W.'s assertion that Reed, Ciocco and Ferrell continued to perform the same functions in Duffy Conley's organization.

The Magistrate Judge had a substantial basis for concluding the Ciocco, Conley, Smith, Reed and Ferrell were conducting an illegal gambling business in violation of 18 U.S.C.1955, notwithstanding the reorganization undertaken in January, 1990.

From C.W.'s account of the relationships between S & M Vending, Matrix and Premier Enterprises and from the nature of the items seized in previous searches that related to Ferrell, it is certainly reasonable to infer that Ferrell acted as a collector in the continuing illegal gambling business.

■ The Magistrate Judge had a substantial basis for concluding that Ferrell's residence would contain evidence of the illegal gambling operation alleged in the Kirsopp Avenue affidavit. The business in Ferrell's name, S & M Vending, had as its registered address 1274 Kirsopp Avenue. Previous searches had revealed telephone numbers relating to Ferrell's business, and a Cole's directory indicated that two of the numbers rang at the Kirsopp Avenue premises. From the evidence found in Ferrell's trash, it is a reasonable inference that Ferrell maintained business records at his home. Ferrell, like Ciocco, had always performed the function of a collector for the illegal gambling business. In view of the information included in the Kirsopp Avenue affidavit regarding S & M Vending, it is a fair and reasonable inference that Ferrell kept business and financial records at his residence.

The Magistrate Judge had a substantial basis under the totality of the circumstances for concluding that probable cause to search existed with respect to Ferrell's residence at 1274 Kirsopp Avenue, Pittsburgh, Pennsylvania.

The October 1, 1991 search of 1274 Kirsopp Avenue, Pittsburgh, Pennsylvania did not violate Defendant Ferrell's Fourth Amendment rights.

The Pretrial Motions Filed on behalf of Defendant Phillip M. "Mike" Ferrell: Motion to Suppress Evidence, (Document No. 379, in part), will be denied, and the Pretrial Motions Filed on behalf of Defendant Phillip M. "Mike" Ferrell: Motion to Return Seized Property, (Document No. 379, in part), will be dismissed without prejudice to Defendant Ferrell's rights in C.A. No. 93–1006.

An appropriate order will be entered.